T.C. Memo. 2011-97

UNITED STATES TAX COURT

WILLIAM PAUL CROUSE, JR., AND CANDRA J. CROUSE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 24660-08.                    Filed May 2, 2011.

William Paul Crouse, Jr., and Candra J. Crouse, pro sese.

<u>Timothy S. Sinnott</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, <u>Judge</u>:  Respondent determined a deficiency in, an
addition under section 6651(a)(1)[1] to, and an accuracy-related
penalty under section 6662(a) on petitioners' Federal income tax

---

[1]All section references are to the Internal Revenue Code
(Code) in effect at all relevant times.  All Rule references are
to the Tax Court Rules of Practice and Procedure.

(tax) for their taxable year 2001 of $1,241,658, $308,373, and $248,332, respectively.

The issues remaining for decision for petitioners' taxable year 2001 are:[2]

(1) Do petitioners have certain unreported income?  We hold that they do.

(2) Are petitioners entitled to deduct a proportionate share of the losses of TRG Administration, LLC?  We hold that they are not.

(3) Are petitioners liable before the application of section 6015 with respect to petitioner Candra J. Crouse for the addition to tax under section 6651(a)(1)?  We hold that they are.

(4) Are petitioners liable before the application of section 6015 with respect to petitioner Candra J. Crouse for the accuracy-related penalty under section 6662(a)?  We hold that they are.

(5) Is petitioner Candra J. Crouse entitled to relief under section 6015 in addition to the relief under that section that respondent concedes?  We hold that she is to the extent stated herein.

---

[2]In addition to the issues remaining for decision for petitioners' taxable year 2001 that are listed below in the text, there are other questions relating to certain determinations in the notice of deficiency for that year that are computational.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

At the time petitioners filed the petition in this case, petitioner William Paul Crouse (Mr. Crouse) resided in Florida, and petitioner Candra J. Crouse (Ms. Crouse) resided in Indiana.

Mr. Crouse is a high school graduate. He also took certain college classes but did not receive a college degree. In 1988, Ms. Crouse graduated from Ball State University with a bachelor of science degree in telecommunications.

During 2001, Mr. Crouse and Carmelo Zanfei (Mr. Zanfei) each owned a 50-percent interest in each of the following three limited liability companies: The Redwood Group, LLC (Redwood), TRG Marketing, LLC (Marketing), and TRG Administration, LLC (Administration). At all relevant times, Redwood, Marketing, and Administration were treated as partnerships for tax purposes because each of those companies had made an election to be so treated.

During 2001, UBA Insurance Services, Inc., paid to Mr. Crouse total nonemployee compensation of $2,842.20 (Mr. Crouse's 2001 nonemployee compensation). It issued to Mr. Crouse two Forms 1099-MISC, Miscellaneous Income (Form 1099-MISC), for that year in which it reported nonemployee compensation paid to him totaling that amount.

In early 2001, Ms. Crouse worked for approximately two months in the customer service department of a company identified

as TRG.[3]  In July 2001, Ms. Crouse learned that she was pregnant and chose to stop working for that company.  At no time did Ms. Crouse participate in any business decisions of Redwood, Marketing, or Administration.  Nor did Ms. Crouse have any responsibilities with respect to the finances of any of those companies.

During 2001, Marketing paid to Ms. Crouse nonemployee compensation of $33,127 (Ms. Crouse's 2001 nonemployee compensation) and reported that amount in Form 1099-MISC that it issued to her for that year.  During 2001, Administration paid to Ms. Crouse wages of $14,226.48 and reported that amount in Form W-2, Wage and Tax Statement, that it issued to her for that year.[4]

From around April 2 through around July 23, 2001, Mr. Crouse embezzled a total of approximately $1.29 million from Redwood, Marketing, and/or Administration, including the amounts discussed below that Mr. Crouse used for his own benefit or the benefit of his family.

---

[3]The record does not establish whether Ms. Crouse worked for Marketing, Administration, and/or Redwood during 2001.  However, as discussed below, during 2001 both Marketing and Administration paid certain amounts to Ms. Crouse.

[4]The record does not establish whether the respective amounts that Administration and Marketing paid to Ms. Crouse during 2001 were compensation for any of the work that Ms. Crouse performed during that year in the customer service department of the company identified as TRG.  See supra note 3.

Around April 2, 2001, Mr. Crouse signed a $62,307.82 check payable to Ms. Crouse and drawn on a certain bank account maintained at National City Bank in the name of "TRG Companies" (TRG bank account), over which Mr. Crouse had signatory authority. That check was deposited into a certain account that petitioners maintained at Fifth Third Bank (Crouse bank account). Both Mr. Crouse and Ms. Crouse had signatory authority over, and withdrew funds from, the Crouse bank account.

Around April 19, 2001, Mr. Crouse withdrew $546,732 from a certain bank account that Administration maintained at Fifth Third Bank (Administration bank account), over which Mr. Crouse had signatory authority. Mr. Crouse used those funds to purchase a so-called official check[5] in the amount of $546,732 payable to Chicago Title. Mr. Crouse used that official check to purchase as petitioners' residence a house in Greenwood, Indiana (Greenwood residence). Ms. Crouse did not sign any documents relating to the purchase of that house and did not make any inquiries of Mr. Crouse or anyone else with respect to the source of the funds used for that purchase. Around May 2001, petitioners moved into their Greenwood residence.

Around May 2, 2001, Mr. Crouse withdrew $193,000 from the TRG bank account. Mr. Crouse used $53,000 of those funds to

---

[5]Although it is not altogether clear, it would appear that an official check is a cashier's check, certified check, or other similar check issued by a bank.

purchase an official check in that amount payable to Ms. Crouse.[6] That check was deposited into the Crouse bank account.

Around June 21, 2001, Mr. Crouse withdrew $100,000 from the Administration bank account. Mr. Crouse used $50,000 of those funds to purchase an official check in that amount payable to Ms. Crouse.[7] That check was deposited into the Crouse bank account.

Around July 6, 2001, Mr. Crouse withdrew $208,000 from a certain bank account held at Fifth Third Bank in the name of Marketing (Marketing bank account), over which Mr. Crouse had signatory authority. Mr. Crouse used $104,000 of those funds to purchase an official check in that amount payable to Ms. Crouse.[8] That check was deposited into the Crouse bank account.

Around July 23, 2001, Mr. Crouse withdrew $180,000 from the Marketing bank account. Mr. Crouse used $80,000 of those funds to purchase an official check in that amount payable to himself.[9] Mr. Crouse endorsed that check and deposited it into the Crouse bank account.

---

[6]The record does not establish what Mr. Crouse did with the remaining $140,000 that he withdrew from the TRG bank account on May 2, 2001.

[7]Mr. Crouse gave to Mr. Zanfei the remaining $50,000.

[8]Mr. Crouse gave to Mr. Zanfei the remaining $104,000.

[9]Mr. Crouse used $10,000 of the remaining funds to purchase an official check in that amount payable to Katheryn Zanfei. Mr. Crouse gave to Mr. Zanfei the remaining $90,000.

Of the approximately $1.29 million that Mr. Crouse embezzled from Redwood, Marketing, and/or Administration, $546,732 was used to purchase the Greenwood residence and $349,307.82 was deposited into the Crouse bank account. Those embezzled amounts total $896,039.82.

In 2003, Mr. Crouse was charged by the State of Florida with operating an insurance company without a license. In 2005, Mr. Crouse pleaded guilty to that charge and was sentenced to a term of imprisonment.

Around December 10, 2004, Redwood filed Form 1065, U.S. Return of Partnership Income (Form 1065), for its taxable year 2001 (2001 Redwood return). In that return, Redwood reported $2,097,280 of ordinary income from trade or business activities for that year. Redwood included with the 2001 Redwood return Schedule K-1, Partner's Share of Income, Credits, Deductions, etc. (Schedule K-1), for taxable year 2001 with respect to each of its two interest-holders, Mr. Crouse and Mr. Zanfei. In the Schedule K-1 that Redwood completed with respect to Mr. Crouse and issued to him (2001 Redwood Schedule K-1), Redwood showed (1) $1,050,796 as Mr. Crouse's share of Redwood's ordinary income from trade or business activities,[10] (2) $854,356 of withdrawals

_____

[10]The amount that Redwood showed in the 2001 Redwood Schedule K-1 as ordinary income from trade or business activities was not equal to Mr. Crouse's proportionate share of such income that Redwood reported in the 2001 Redwood return. As discussed above,
(continued...)

by, and distributions to, Mr. Crouse, and (3) $248,535 as Mr. Crouse's capital account at the end of the 2001 taxable year.

Around January 10, 2005, Marketing filed Form 1065 for its taxable year 2001 (2001 Marketing return). In that return, Marketing reported $2,086,591 of ordinary income from trade or business activities for that year. Marketing included with the 2001 Marketing return Schedule K-1 for taxable year 2001 with respect to each of its two interest-holders, Mr. Crouse and Mr. Zanfei. In the Schedule K-1 that Marketing completed with respect to Mr. Crouse and issued to him (2001 Marketing Schedule K-1), Marketing showed (1) $1,043,295 as Mr. Crouse's share of Marketing's ordinary income from trade or business activities,[11]

---

[10](...continued)
in the 2001 Redwood return Redwood reported $2,097,280 of ordinary income from trade or business activities. Mr. Crouse's proportionate share (i.e., 50 percent) of that income is $1,048,640 and not $1,050,796 as Redwood showed in the 2001 Redwood Schedule K-1. Redwood attached to the 2001 Redwood return Schedule K, Partners' Shares of Income, Credits, Deductions, etc. (Schedule K), in which it showed $2,101,592 of ordinary income from trade or business activities for its taxable year 2001. The $1,050,796 that Redwood showed in the 2001 Redwood Schedule K-1 equals Mr. Crouse's proportionate share (i.e., 50 percent) of the $2,101,592 that Redwood showed as ordinary income from trade or business activities in the Schedule K that it attached to the 2001 Redwood return. The record does not establish why there is a discrepancy between the amount of ordinary income from trade or business activities that Redwood reported in the 2001 Redwood return and the amount of such ordinary income Redwood showed in the Schedule K that it attached to that return.

[11]The amount that Marketing showed in the 2001 Marketing Schedule K-1 as ordinary income from trade or business activities
(continued...)

(2) no withdrawals by, or distributions to, Mr. Crouse, and (3) $1,043,158 as Mr. Crouse's capital account at the end of the 2001 taxable year.

Around January 10, 2005, Administration filed Form 1065 for its taxable year 2001 (2001 Administration return).  In that return, Administration reported $6,876,542 as an ordinary loss from trade or business activities for that year.  Administration included with the 2001 Administration return Schedule K-1 for taxable year 2001 with respect to each of its two interest-holders, Mr. Crouse and Mr. Zanfei.  In the Schedule K-1 that Administration completed with respect to Mr. Crouse and issued to him (2001 Administration Schedule K-1), Administration showed (1) $3,449,325 as Mr. Crouse's share of Administration's ordinary loss from trade or business activities,[12] (2) no withdrawals by,

_____

[11](...continued)
was equal to Mr. Crouse's proportionate share of such income that Marketing reported in the 2001 Marketing return.

[12]The amount that Administration showed in the 2001 Administration Schedule K-1 as an ordinary loss from trade or business activities was not equal to Mr. Crouse's proportionate share of such loss that Administration reported in the 2001 Administration return.  As discussed above, in the 2001 Administration return Administration reported $6,876,542 as an ordinary loss from trade or business activities.  Mr. Crouse's proportionate share (i.e., 50 percent) of that loss is $3,438,271 and not $3,449,325 as Administration showed in the 2001 Administration Schedule K-1. Administration attached to the 2001 Administration return Schedule M-1, Reconciliation of Income (Loss) per Books With Income (Loss) per Return (Schedule M-1), and Schedule M-2, Analysis of Partners' Capital Accounts (Schedule M-2).  In both of those schedules Administration showed $6,898,650 as a "Net * * * (loss)
(continued...)

or distributions to, Mr. Crouse, and (3) $3,449,325 as Mr. Crouse's capital account at the end of the 2001 taxable year.

On October 10, 2005, Mr. Crouse reported to prison in Florida to serve the prison term to which he had been sentenced after he pleaded guilty to the charge of operating an insurance company without a license.

On October 14, 2005, petitioners jointly filed Form 1040, U.S. Individual Income Tax Return, for their taxable year 2001 (2001 joint return) that both Mr. Crouse and Ms. Crouse signed. Ms. Crouse did not review that return or inquire about its accuracy before she signed it. At the time she signed the 2001 joint return, Ms. Crouse did not suffer from any physical or mental illness.

In the 2001 joint return, petitioners reported, inter alia, wage income of $93,329.05. That amount included (1) Mr. Crouse's 2001 nonemployee compensation and (2) Ms. Crouse's 2001 nonemployee compensation.

Petitioners attached to the 2001 joint return the 2001 Redwood Schedule K-1, the 2001 Marketing Schedule K-1, and

---

[12](...continued)
per books" for its taxable year 2001. The $3,449,325 that Administration showed in the 2001 Administration Schedule K-1 equals Mr. Crouse's proportionate share (i.e., 50 percent) of the $6,898,650 that Administration showed as a "Net * * * (loss) per books" in each of Schedule M-1 and Schedule M-2 that it attached to the 2001 Administration return.

the 2001 Administration Schedule K-1.  Petitioners also attached to the 2001 joint return Schedule E, Supplemental Income and Loss (2001 Schedule E).  In the 2001 Schedule E, petitioners showed a total loss of $1,266,109 that was derived almost entirely from (1) $1,043,295 of ordinary income from trade or business activities that Marketing showed in the 2001 Marketing Schedule K-1, (2) $1,050,796 of ordinary income from trade or business activities that Redwood showed in the 2001 Redwood Schedule K-1, and (3) $3,376,356 of ordinary loss from trade or business activities (2001 Administration loss) that Administration showed in the 2001 Administration Schedule K-1.[13]  Petitioners reduced the total income that they reported in the 2001 joint return by the total loss of $1,266,109 that they reported in the 2001 Schedule E.  Petitioners reported in the 2001 joint return no taxable income, no tax, and no self-employment tax.

Around March 22, 2006, a Federal grand jury in the U.S. District Court for the Southern District of Indiana (District Court) indicted Mr. Crouse for embezzlement and money laundering with respect to the amounts that Mr. Crouse embezzled from Redwood, Marketing, and/or Administration from around April 2 through around July 23, 2001.  With respect to each of the

---

[13]In the 2001 Schedule E, petitioners also reported $16,156 of total rental real estate income from two rental real estate properties.

official checks that Mr. Crouse purchased that were made payable to Ms. Crouse, the indictment against Mr. Crouse stated that the "official check [made payable to Ms. Crouse] was endorsed by Candra J. Crouse".

On October 18, 2006, Mr. Crouse entered a plea of guilty in the District Court to six counts of embezzlement and one count of money laundering. On December 4, 2007, the District Court sentenced Mr. Crouse to, inter alia, 57 months' imprisonment that was to run concurrently with the sentence that Mr. Crouse had received in Florida on the charge of operating an insurance company without a license.

On July 16, 2008, respondent issued to petitioners a notice of deficiency (2001 notice) for their taxable year 2001, in which respondent determined a deficiency of $1,241,658 in petitioners' tax for that year. In that notice, respondent determined, inter alia, (1) to recharacterize as self-employment income subject to self-employment tax Mr. Crouse's 2001 nonemployee compensation and Ms. Crouse's 2001 nonemployee compensation,[14] (2) to include in gross income embezzlement income subject to self-employment tax of $299,308, which equaled the total amount that Mr. Crouse withdrew from the TRG bank account and the Marketing bank account

---

[14]Petitioners concede that Mr. Crouse's 2001 nonemployee compensation and Ms. Crouse's 2001 nonemployee compensation are self-employment income of petitioners for their taxable year 2001. Petitioners also concede that that income is subject to self-employment tax for that year.

and that was deposited in the Crouse bank account, (3) to include in gross income embezzlement income not subject to self-employment tax of $596,732, which equaled the total amount that Mr. Crouse withdrew from the Administration bank account and that Mr. Crouse used primarily to purchase the Greenwood residence,[15] and (4) to disallow the claimed deduction for the 2001 Administration loss. Respondent also determined in the 2001 notice that petitioners are liable for the addition to tax under section 6651(a)(1) and the accuracy-related penalty under section 6662(a).

Around March 24, 2009, Ms. Crouse filed Form 8857, Request for Innocent Spouse Relief (Ms. Crouse's Form 8857). In that form, Ms. Crouse claimed that she had total monthly income of $4,166 and total monthly expenses of $4,142. Those claimed expenses consisted of:

---

[15]The $299,308 of embezzlement income subject to self-employment tax that respondent determined to include in petitioners' gross income and the $596,732 of embezzlement income not subject to self-employment tax that respondent determined to include in gross income total $896,040. In the 2001 notice, respondent did not determine to include in petitioners' gross income approximately $394,000, the balance of the approximate amount (i.e., $1.29 million) that Mr. Crouse embezzled from Redwood, Marketing, and/or Administration.

| Claimed Monthly Expense | Amount |
|---|---|
| Federal, State, and local taxes | $966 |
| Rent or mortgage | 885 |
| Utilities | 300 |
| Telephone | 92 |
| Food | 800 |
| Car (including car payments and insurance) | 350 |
| Medical expenses | 175 |
| Life insurance | 29 |
| Clothing | 50 |
| Child care | 200 |
| Storage unit | 75 |
| Cell phone | 170 |
| Cable | 50 |
| Total | 4,142 |

Ms. Crouse did not attach any documentation to Ms. Crouse's Form 8857 to establish that she had each of the monthly expenses that she claimed in that form. Around May 2009, after Ms. Crouse filed Ms. Crouse's Form 8857, she discontinued her home telephone service, which she claimed in that form cost $92 a month.

After reviewing Ms. Crouse's request, respondent's examiner prepared an examination workpaper dated May 27, 2009 (examination workpaper). The examination workpaper stated, inter alia:

**GENERAL INFORMATION**

Partial - She is liable for part of the understatement. They both reported their NEC [nonemployee compensation] income as wages. They are liable for the SE [self-employment] tax on this income. She had actual knowledge of his NEC he reported as wages, $269,308 of embezzled income paid to her, she deposited to joint account. She had constructive knowledge of $626,732 embezzled income, $80,000 made out the him, deposited into joint account & $546,732 made out the Chicago Title for the home. She had no knowledge of his Sch E

loss that was disallowed & added as income $3,376,356. She did not help in his business nor was she partner.

## General Info Continued
## ~~SPOUSE'S RESPONSE~~

General info continued - She has not been compliant with all tax laws.  has filing requirement for 2002, 2007 & 2008 & no rtn filed.  2003 filed late with bal due & no pmts. 2004, 2005 & 2006 are SFR [substitute for return] rtn filed since she did not file a rtn. They are still married & living together.

## EVALUATION PROCESS

### Year 2001

### IRC 6015(b)
Liability arose on or after July 22, 1998
Understatement of tax
No payments were made by the RS [requesting spouse]
Taxpayers are currently not divorced, widowed or legally separated, and did not live apart prior to the claim - relief is not available under IRC 6015(c)
Filed a joint return
Joint return is valid
There is enough information to determine the claim
Balance due remaining
RS did not sign the amended return or a waiver
There was not a deficiency notice, or the notice was not closed in default
There is a potential deficiency pending
Statutory Notice of Deficiency has been issued
No OIC accepted
Claim filed timely
Over $1,500 of understatement - full scope
Understatement of tax attributable to both spouses
Erroneous items:     Per exam audit they both listed their NEC income as wages, Candra $33,127 & William $2,842.  William had also embezzled money $896,040. William's Schedule E income was also increased to $3,376,356.
RS's attribution does not meet the attribution exceptions.  This portion will be denied under IRC 6015(f). Continue IRC 6015(b) for the portion attributable to the NRS [nonrequesting spouse].

**Knowledge factors:**

Background:

   RS - College Degree          NRS -
      Bachelor of Science

Involvement:

   RS - She stated not involved   NRS - They had a
      in household finances.         joint account
      However per the court         & he also had
      document on his guilty        separate
      plea of embezzled in-        business
      come, they had a joint       accounts.
      account she had full
      access to & used.
      She made deposits.

Lifestyle changes:    No
NRS's elusiveness:    No
Duty to inquire:     She did not review the return
                     before signing it.
Living arrangements:  Lived together all year.
RS had actual knowledge of some items, constructive
knowledge of some items, and no knowledge of others
when return, CP2000, Form 1040X, etc. was signed
Explanation:           She had actual knowledge of
                     $269,308 embezzled income,
                     checks written to her, she
                     signed & deposited into joint
                     account. Constructive knowledge
                     of $80,000 embezzled income he
                     made out to himself & deposited
                     into joint account & $546,732
                     embezzled income he made out to
                     Chicago Title for the house. Had
                     actual knowledge of his NEC he
                     reported as wages on rtn [re-
                     turn]. No knowledge of Sch E
                     income.
The items with actual knowledge will be considered
under IRC 6015(f) full scope
The items with constructive knowledge will be consid-
ered under IRC 6015(c)
Continue IRC 6015(b) for the items with no knowledge

**Inequitable factors:**
Taxpayers are currently not divorced, widowed or legally separated, and did not live apart prior to the claim for at least 12 consecutive months
No economic hardship
Explanation:      She overstated expenses & listed expenses not considered basic living such as $50 cable, $170 cell phone, $75 storage, $92 house phone allowed $40 & $800 food. After making changes her income exceeds expenses by $821 a month.
No marital abuse
No poor mental or physical health
No legal obligation established
No significant benefit gained
Explanation:      She did not receive any benefit.
Did not make a good faith effort to comply with the tax laws.
Explanation:      She has filing requirement for 2002, 2007 & 2008 and no returns filed. 2003 rtn was filed late, with balance due & no payments. 2004, 2005 & 2006 are all SFR filed tax returns. No rtn filed by her & balance due on these years with no payments being made.
Unique circumstances: No
Equitability test failed - deny claim
Equitability:  Based on the above facts it is equitable to hold the RS liable for the balance. She is liable for part of US [understatement]. She had constructive/actual knowledge of income not reported or reported incorrectly. She has not been compliant with tax laws. They are still married & living together.

**Claim denied under IRC 6015(b)**
**Switched to IRC 6015(c)**

**IRC 6015(c)**
Taxpayers are currently not divorced, widowed or legally separated
Taxpayers had not been members of separate households for at least 12 consecutive months - deny claim under IRC 6015(c)

**Claim denied under IRC 6015(c)**
**Also deny under 6015(f) based on inequitable factors**

**CONCLUSION**

    Partial
2001- ~~Denied~~ under 6015(b)~~,(c),(f)~~

    **Comment:**
Partial - She is liable for part of the understatement.
She had actual/constructive knowledge of the embezzled
income, actual knowledge of his NEC that was reported
as wages & no knowledge of the Sch E loss that was
disallowed.  She has not been compliant with all tax
laws.  It will not cause an economic hardship.  They
are still married & living together.  [Reproduced
literally.]

Respondent concluded that Ms. Crouse is entitled to relief

under section 6015(b) with respect to the respective portions

totaling $989,748 of the deficiency for 2001 that are attribut-

able to respondent's determinations disallowing petitioners'

claimed deduction for the 2001 Administration loss and

recharacterizing as self-employment income subject to self-

employment tax Mr. Crouse's 2001 nonemployee compensation

of $2,842.20.[16]  Respondent concluded that Ms. Crouse is not

---

[16]In the examination workpaper, respondent's examiner con-
cluded that Ms. Crouse was not entitled to relief under sec.
6015(b) with respect to the portion of the deficiency for 2001
that is attributable to respondent's recharacterizing as self-
employment income subject to self-employment tax Mr. Crouse's
2001 nonemployee compensation.  After respondent's examiner
prepared that workpaper, respondent prepared a so-called innocent
spouse allocation worksheet for the purpose of calculating the
amount of the portion of the deficiency for 2001 with respect to
which Ms. Crouse is entitled to relief.  In that allocation
worksheet, respondent concluded that Ms. Crouse is entitled to
relief under sec. 6015 with respect to $989,748 of the deficiency
for 2001.  That amount included that portion of the deficiency
(continued...)

entitled to relief under section 6015(b), (c), or (f) with respect to the respective portions totaling $251,910 of the deficiency for 2001 that are attributable to respondent's determinations in the 2001 notice (1) to recharacterize as self-employment income subject to self-employment tax Ms. Crouse's 2001 nonemployee compensation of $33,127 and (2) to include in gross income (a) embezzlement income of $299,308 that is subject to self-employment tax and (b) embezzlement income of $596,732 that is not subject to self-employment tax. Around July 10, 2009, Mr. Crouse sent to respondent's Appeals Office a letter dated July 6, 2009. Mr. Crouse attached to that letter completed Form 12507, Innocent Spouse - Statement (Mr. Crouse's Form 12507), and Form 12508, Questionnaire for Non-Requesting Spouse (Mr. Crouse's Form 12508).

In Mr. Crouse's Form 12507, Mr. Crouse stated:

> My spouse, Candra Jill Crouse, has never been involved in the business in which the IRS claims has [sic] created a deficiency in taxation. Therefore, she should not be part of these proceedings. In addition, my spouse never had any information about the finances of any of the companies in question.

In Mr. Crouse's Form 12508, Mr. Crouse stated that the "2001 Tax Returns were prepared by my business partner Carmelo Zanfei.

---

[16](...continued) attributable to respondent's determination recharacterizing as self-employment income subject to self-employment tax Mr. Crouse's 2001 nonemployee compensation. On brief, respondent concedes that Ms. Crouse is entitled to relief under sec. 6015(b) with respect to $989,748 of the deficiency for 2001.

My spouse and I signed the returns, without reviewing, the morning I left to catch a plane to Florida to report to prison on 10-10-2005." In Mr. Crouse's Form 12508, Mr. Crouse also stated that his "Spouse [Ms. Crouse] worked for a couple of months in our Customer Service Department. Did not participate in any other capacity" and that his "Spouse did not participate in the Company operations and the amounts of tax in Dispute had nothing to do with her."

At all relevant times, including during the year at issue, at the time Mr. Crouse was released from prison on November 27, 2009, and at the time of the trial in this case, Mr. Crouse and Ms. Crouse were married. At no time during their marriage did Mr. Crouse abuse Ms. Crouse. Before Mr. Crouse was released from prison on November 27, 2009, petitioners had not discussed whether they would divorce, and neither Mr. Crouse nor Ms. Crouse had filed for divorce as of that date. Around February or March 2010, several months before the trial in this case, Mr. Crouse filed for divorce. At an undisclosed time between the date on which Mr. Crouse was released from prison and the date of that trial, petitioners began living separate and apart.

At the time of the trial in this case, Ms. Crouse had not filed timely a tax return for any of her taxable years 2003

through 2008.[17] Nor had Ms. Crouse timely paid as of the time of the trial in this case the tax for any of her taxable years 2003 through 2006 that respondent determined was due.[18]

During 2010, Ms. Crouse received a 4.5-percent raise in her salary. At the time of the trial in this case, she no longer maintained the storage unit costing $75 per month that she claimed in Ms. Crouse's Form 8857. At that time, Ms. Crouse had total monthly income of $4,353 and total monthly expenses of $4,010 that consisted of:

---

[17]The record does not establish whether Ms. Crouse filed on or before Apr. 15, 2010, (1) a return for her taxable year 2009, or (2) a request for an extension of time within which to file that return.

[18]The record does not establish whether Ms. Crouse paid timely the tax for each of her taxable years 2007 through 2009 that respondent determined was due.

| Claimed Monthly Expense | Amount |
|---|---|
| Federal, State, and local taxes | [1]$1,001 |
| Rent or mortgage | 885 |
| Utilities | 300 |
| Food | 800 |
| Car (including car payments and insurance) | 350 |
| Medical expenses | 175 |
| Life insurance | 29 |
| Clothing | 50 |
| Child care | 200 |
| Cell phone | 170 |
| Cable | 50 |
| Total | 4,010 |

[1]We approximated as of the time of the trial in this case the total amount of the Federal, State and local taxes that Ms. Crouse paid each month on the 4.5-percent increase in her monthly salary. As a result, the total monthly expenses that we have found is an approximate amount. For convenience, we shall not refer to that total monthly amount as approximate.

OPINION

Petitioners bear the burden of proving that the determinations in the 2001 notice are erroneous. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Ms. Crouse bears the burden of proof with respect to her claim under section 6015.

Respondent's Determinations in the 2001 Notice

We turn first to whether petitioners must include in gross income for 2001 a total of $896,039.82 of the approximately $1.29 million that Mr. Crouse embezzled during that year from Redwood, Marketing, and/or Administration.[19] Section 61(a) defines the

_____

[19]Mr. Crouse embezzled approximately $1.29 million from Redwood, Marketing, and/or Administration during 2001. However, respondent did not determine in the 2001 notice to include in

(continued...)

term "gross income" broadly to mean all income from whatever source derived. Generally, embezzled funds are includible in gross income for the year in which those funds are embezzled. James v. United States, 366 U.S. 213, 219 (1961).

It is Mr. Crouse's position[20] that the "amounts he pled guilty to in Federal Court, for Embezzlement, were claimed on taxes." According to Mr. Crouse, Redwood showed as disbursements in the 2001 Redwood Schedule K-1 the amounts that he embezzled from Redwood, Marketing, and/or Administration.[21]

We have found that the embezzled amounts totaling $896,039.82 that Mr. Crouse embezzled from Redwood, Marketing, and/or Administration were deposited into the Crouse bank account and were used to purchase the Greenwood residence. We have also

[19](...continued)
petitioners' gross income the $393,960 difference between that total approximate embezzled amount and the $896,040 that respondent determined in that notice to include in petitioners' gross income. See supra note 15.

[20]Pursuant to the direction of the Court, Mr. Crouse and Ms. Crouse filed separate respective opening briefs and answering briefs. Mr. Crouse addresses in his briefs all of the issues remaining in this case. Ms. Crouse addresses in her briefs only the issue under sec. 6015.

[21]Mr. Crouse also claims on brief that in 2007 Mr. Zanfei filed respective amended returns on behalf of Redwood, Marketing, and Administration for their respective taxable years 2001 because "the disbursed amounts were attributed to the wrong entity(s)." However, petitioners have not proffered any credible evidence that Mr. Zanfei filed any such amended returns. Nor have they proffered any credible evidence regarding the alleged contents of any such amended returns.

found that in the 2001 Redwood Schedule K-1, Redwood showed, inter alia, $854,356 of withdrawals by, and distributions to, Mr. Crouse.  However, petitioners have failed to proffer any credible evidence that the $854,356 that Redwood showed as withdrawals by, or distributions to, Mr. Crouse included any portion, let alone all, of the embezzled amounts.

On the record before us, we find that petitioners have failed to carry their burden of establishing that they reported in the 2001 joint return the embezzled amounts totaling $896,039.82 that Mr. Crouse embezzled from Redwood, Marketing, and/or Administration.

We turn next to whether petitioners are entitled to deduct for 2001 the 2001 Administration loss.  Section 704(d) provides in pertinent part:

> SEC. 704(d).  Limitation on Allowance of Losses.--
> A partner's distributive share of partnership loss
> (including capital loss) shall be allowed only to the
> extent of the adjusted basis of such partner's interest
> in the partnership at the end of the partnership year
> in which such loss occurred. * * *.

For purposes of section 704(d), the adjusted basis of a partner's interest in a partnership includes the partner's adjusted basis in any property, including money, that the partner has contributed to the partnership.  See sec. 722.  Section 752(a) provides:

> SEC. 752(a).  Increase in Partner's Liabilities.--
> Any increase in a partner's share of the liabilities of
> a partnership, or any increase in a partner's individ-
> ual liabilities by reason of the assumption by such
> partner of partnership liabilities, shall be considered

as a contribution of money by such partner to the partnership.

A partner is considered to have assumed a partnership liability only to the extent that (1) the partner is personally obligated to pay the liability, (2) the person to whom the liability is owed knows of the assumption and can directly enforce the partner's obligation for the liability, and (3) no other partner or person that is a related person to another partner is to bear the economic risk of loss for the liability immediately after the assumption. Sec. 1.752-1(d), Income Tax Regs.

It is respondent's position that petitioners are not entitled to deduct the 2001 Administration loss. That is because, according to respondent, petitioners have failed to establish (1) that Mr. Crouse contributed any property or money to Administration, (2) that Mr. Crouse's share of the liabilities of Administration increased during 2001, or (3) that Mr. Crouse assumed any liabilities of Administration during 2001.

It is Mr. Crouse's position that he is entitled to deduct the 2001 Administration loss. In support of that position, Mr. Crouse argues that he had an adjusted basis in his 50-percent interest in Administration in excess of the 2001 Administration loss. According to Mr. Crouse:

On December 31, 2001, the accounting books [of Administration] reflected a liability of more than $7,000,000.00. This was comprised of Health Plan medical Claims by the members of the company sponsored health plan. The plan was ended on November 30, 2001,

and the partners [including Mr. Crouse] assumed the liabilities of the unpaid claims.  Further, over the course of trying to work with regulators and claims processors, a Civil Judgment was entered against the partners in the * * * [District Court] in the amount of more than $4,000,000.00  * * *.  Further, WPC [Mr. Crouse] pled guilty to criminal charges in the State of Florida regarding the Company Sponsored Health Plan and restitution was ordered in the amount of $2,971,713.84 to pay the outstanding liabilities discussed in this case.

Petitioners do not claim that Mr. Crouse contributed any money or property to Administration.  In addition, petitioners have not proffered any credible evidence that Administration had any liabilities at the end of its taxable year 2001 or that Mr. Crouse assumed any portion of any such liabilities that Mr. Crouse alleges Administration owed.  Nor have petitioners proffered any credible evidence that, as Mr. Crouse alleges, the District Court entered a judgment against Mr. Crouse or a Florida State court ordered him to pay restitution, let alone that that alleged judgment and that alleged order were in the amounts of $4 million and $2,971,713.84, respectively.

On the record before us, we find that petitioners have failed to carry their burden of establishing that at the end of taxable year 2001 Mr. Crouse had any basis in his 50-percent interest in Administration.  On that record, we further find that petitioners have failed to carry their burden of establishing that they are entitled to deduct for 2001 the 2001 Administration loss.

We turn next to whether petitioners are liable before the application of section 6015 with respect to Ms. Crouse for their taxable year 2001 for the addition to tax under section 6651(a)(1) and the accuracy-related penalty under section 6662(a).  Section 6651(a)(1) imposes an addition to tax for failure to file timely a return.[22]  The addition to tax under section 6651(a)(1) does not apply if the failure to file timely is due to reasonable cause, and not to willful neglect.  Sec. 6651(a)(1).

Section 6662(a) imposes an accuracy-related penalty equal to 20 percent of the underpayment to which section 6662 applies. Section 6662 applies to the portion of any underpayment which is attributable to, inter alia, (1) negligence or disregard of rules or regulations, sec. 6662(b)(1), or (2) a substantial understatement of tax, sec. 6662(b)(2).

The term "negligence" in section 6662(b)(1) includes any failure to make a reasonable attempt to comply with the Code. Sec. 6662(c).  Negligence has also been defined as a failure to do what a reasonable person would do under the circumstances. Leuhsler v. Commissioner, 963 F.2d 907, 910 (6th Cir. 1992), affg. T.C. Memo. 1991-179; Antonides v. Commissioner, 91 T.C.

---

[22]The addition to tax imposed under sec. 6651(a)(1) is equal to 5 percent of the amount of tax required to be shown in the return, with an additional 5 percent to be added for each month or partial month during which the failure to file timely a return continues, not to exceed 25 percent in the aggregate.

686, 699 (1988), affd. 893 F.2d 656 (4th Cir. 1990). The term "negligence" also includes any failure by the taxpayer to keep adequate books and records or to substantiate items properly. Sec. 1.6662-3(b)(1), Income Tax Regs. The term "disregard" includes any careless, reckless, or intentional disregard. Sec. 6662(c).

For purposes of section 6662(b)(2), an understatement is equal to the excess of the amount of tax required to be shown in the tax return over the amount of tax shown in such return. Sec. 6662(d)(2)(A). An understatement is substantial in the case of an individual if the amount of the understatement for the taxable year exceeds the greater of ten percent of the tax required to be shown in the tax return for that year or $5,000. Sec. 6662(d)(1)(A).

The accuracy-related penalty under section 6662(a) does not apply to any portion of an underpayment if it is shown that there was reasonable cause for, and that the taxpayer acted in good faith with respect to, such portion. Sec. 6664(c)(1). The determination of whether the taxpayer acted with reasonable cause and in good faith depends on the pertinent facts and circum-stances, including the taxpayer's efforts to assess such tax-payer's proper tax liability, the knowledge and experience of the taxpayer, and the reliance on the advice of a professional, such as an accountant. Sec. 1.6664-4(b)(1), Income Tax Regs.

Respondent has the burden of production with respect to the addition to tax under section 6651(a)(1) and the accuracy-related penalty under section 6662(a) that respondent determined in the 2001 notice. See sec. 7491(c); Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001). To satisfy respondent's burden of production, respondent must come forward with "sufficient evidence indicating that it is appropriate to impose" the addition to tax and the accuracy-related penalty. Higbee v. Commissioner, supra at 446. Although respondent bears the burden of production with respect to the addition to tax under section 6651(a)(1) and the accuracy-related penalty under section 6662(a) that respondent determined, respondent "need not introduce evidence regarding reasonable cause * * * or similar provisions. * * * the taxpayer bears the burden of proof with regard to those issues." Id. at 446.

With respect to the addition to tax under section 6651(a)(1), we have found that on October 14, 2005, over three years after the 2001 return was due without extensions, petitioners jointly filed that return. On the record before us, we find that respondent has carried respondent's burden of production under section 7491(c) with respect to the addition to tax under section 6651(a)(1).

Mr. Crouse's only argument on brief with respect to the addition to tax under section 6651(a)(1) is that petitioners

are not liable for that addition to tax because "there are no taxes due, but rather a credit".  We have sustained respondent's determinations in the 2001 notice.  As a result, there is a deficiency for petitioners' taxable year 2001.

On the record before us, we find that petitioners have failed to carry their burden of establishing that they are not liable before the application of section 6015 with respect to Ms. Crouse for their taxable year 2001 for the addition to tax under section 6651(a)(1).

With respect to the accuracy-related penalty under section 6662(a), respondent argues that petitioners are liable for that penalty because of a substantial understatement of tax under section 6662(b)(2) that is attributable to the determinations that respondent made in the 2001 notice and, in the alternative, because of negligence or disregard of rules or regulations under section 6662(b)(1).

The accuracy-related penalty that respondent determined for 2001 is imposed on an underpayment of tax for that year that is attributable to a substantial understatement of tax[23] resulting almost entirely from respondent's determinations (1) to include in gross income the embezzled amounts totaling $896,039.82 and (2) to disallow the 2001 Administration loss.  We have sustained

---

[23]In the 2001 notice, respondent determined a deficiency of $1,241,658 for 2001.  Petitioners reported in the 2001 joint return no tax and no self-employment tax.

both of those determinations.[24]  On the record before us, we find
that respondent has satisfied respondent's burden of production
under section 7491(c) with respect to the accuracy-related
penalty under section 6662(a).

As was true of his argument regarding section 6651(a)(1),
Mr. Crouse's only argument with respect to the accuracy-related
penalty under section 6662(a) is that petitioners are not liable
for that penalty because "there are no taxes due, but rather a
credit".  We have sustained respondent's determinations in the
2001 notice.  As a result, there is a substantial understatement
of petitioners' tax under section 6662(b)(2) for their taxable
year 2001.

On the record before us, we find that petitioners have
failed to carry their burden of establishing that they are not
liable before the application of section 6015 with respect to
Ms. Crouse for their taxable year 2001 for the accuracy-related
penalty under section 6662(a).

Ms. Crouse's Request for Relief Under Section 6015

We turn finally to Ms. Crouse's claim for relief under
section 6015.  It is Ms. Crouse's position that she is entitled
to total relief under that section for her taxable year 2001.

---

[24]In addition, petitioners did not proffer any books or
other records that establish any of their positions with respect
to the determinations in the 2001 notice.  On the record before
us, we find that petitioners did not maintain the records re-
quired by sec. 6001 and sec. 1.6001-1(a), Income Tax Regs.

Respondent disagrees, although respondent concedes that Ms. Crouse is entitled to relief under section 6015(b) with respect to the respective portions totaling $989,748 of the deficiency for 2001 that are attributable to respondent's determinations in the 2001 notice (1) to recharacterize as self-employment income subject to self-employment tax Mr. Crouse's 2001 nonemployee compensation and (2) to disallow the claimed deduction for the 2001 Administration loss.

Section 6015(b)

We turn first to whether, as Ms. Crouse argues and as respondent disputes, she is entitled to relief under section 6015(b) with respect to the respective portions totaling $251,910 of the deficiency that are attributable to respondent's determinations (1) to recharacterize as self-employment income subject to self-employment tax Ms. Crouse's 2001 nonemployee compensation and (2) to include in gross income the embezzled amounts totaling $896,039.82.[25]

Section 6015(b) provides in pertinent part:

SEC. 6015.   RELIEF FROM JOINT AND SEVERAL LIABILITY ON JOINT RETURN.

(b) Procedures For Relief From Liability Applicable to All Joint Filers.--

---

[25]Although Mr. Crouse embezzled approximately $1.29 million from Redwood, Marketing, and/or Administration, the only amount at issue in this case is $896,039.82.  See supra note 15.

(1) In general.--Under procedures prescribed by the Secretary, if--

    (A) a joint return has been made for a taxable year;

    (B) on such return there is an understatement of tax attributable to erroneous items of 1 individual filing the joint return;

    (C) the other individual filing the joint return establishes that in signing the return he or she did not know, and had no reason to know, that there was such understatement;

    (D) taking into account all the facts and circumstances, it is inequitable to hold the other individual liable for the deficiency in tax for such taxable year attributable to such understatement; and

    (E) the other individual elects (in such form as the Secretary may prescribe) the benefits of this subsection not later than the date which is 2 years after the date the Secretary has begun collection activities with respect to the individual making the election,

then the other individual shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such understatement.

The failure to satisfy any one of the requirements under section 6015(b) disqualifies the requesting spouse from obtaining relief under that section.  See Alt v. Commissioner, 119 T.C. 306, 313 (2002), affd. 101 Fed. Appx. 34 (6th Cir. 2004).

Respondent concedes that Ms. Crouse satisfies the requirements of (1) section 6015(b)(1)(A) and (E) with respect to the entire understatement[26] and (2) section 6015(b)(1)(B) with respect to that portion of the understatement that is attributable to petitioners' failure to include in gross income the embezzled amounts totaling $896,039.82.

It is respondent's position that Ms. Crouse has failed to establish that she satisfies the requirements of (1) section 6015(b)(1)(B), (C), and (D) with respect to the portion of the understatement that is attributable to the self-employment tax on Ms. Crouse's 2001 nonemployee compensation and (2) section 6015(b)(1)(C) and (D) with respect to the portion of the understatement that is attributable to petitioners' failure to include in gross income the embezzled amounts totaling $896,039.82.

With respect to the portion of the understatement that is attributable to the self-employment tax on Ms. Crouse's 2001 nonemployee compensation, we have found that during 2001 Marketing paid to Ms. Crouse nonemployee compensation of $33,127. Petitioners concede the correctness of respondent's determination in the 2001 notice to recharacterize Ms. Crouse's 2001

---

[26]Sec. 6015(b) uses the term "understatement". As discussed below, sec. 6015(c) and (f) uses the term "deficiency". In this case, the understatement for purposes of sec. 6015(b) is equal to the deficiency that respondent determined for 2001.

nonemployee compensation as self-employment income subject to self-employment tax.

On the record before us, we find that the portion of the understatement that is attributable to the self-employment tax on Ms. Crouse's 2001 nonemployee compensation is attributable to Ms. Crouse. On that record, we further find that Ms. Crouse does not satisfy the requirements of section 6015(b)(1)(B) with respect to the portion of the understatement that is attributable to that self-employment tax. On the record before us, we find that Ms. Crouse is not entitled to relief under section 6015(b) for that portion of the understatement.[27]

We turn now to whether Ms. Crouse satisfies the requirements of section 6015(b)(1)(C) and (D) with respect to the portion of the understatement that is attributable to petitioners' failure to include in gross income the embezzled amounts totaling $896,039.82. In order to show that she satisfies section 6015(b)(1)(C), Ms. Crouse must establish that in signing the 2001 joint return she did not know, and had no reason to know, of the understatement of tax in that return that is attributable to the failure to include in gross income the embezzled amounts totaling

_____

[27]In the light of our finding that Ms. Crouse does not satisfy the requirements of sec. 6015(b)(1)(B) with respect to the portion of the understatement that is attributable to the self-employment tax on Ms. Crouse's 2001 nonemployee compensation, we need not and shall not address whether Ms. Crouse satisfies the requirements of sec. 6015(b)(1)(C) and (D) with respect to that portion of the understatement.

$896,039.82. (We shall sometimes refer to (1) Ms. Crouse's knowing of the understatement attributable to petitioners' failure to include in gross income the embezzled amounts totaling $896,039.82 as Ms. Crouse's having actual knowledge of that understatement and (2) Ms. Crouse's having reason to know of that understatement as Ms. Crouse's having constructive knowledge of that understatement.)

Respondent argues that Ms. Crouse had actual knowledge for purposes of section 6015(b)(1)(C) of $269,307.82 of the embezzled amounts totaling $896,039.82 because $269,307.82 is the total amount of the four official checks[28] made payable to Ms. Crouse that Mr. Crouse purchased and that respondent contends Ms. Crouse endorsed and deposited into the Crouse bank account (four official checks in question) during 2001. In support of respondent's argument, respondent relies upon (1) the indictment filed in the District Court against Mr. Crouse for embezzlement and money laundering that resulted in a criminal case against Mr. Crouse in that court, in which Ms. Crouse was not a party, which stated with respect to each of those four official checks that the "official check [made payable to Ms. Crouse] was endorsed by

---

[28]Respondent does not argue that Ms. Crouse had actual knowledge of (1) the $80,000 official check that was made payable to Mr. Crouse and that was deposited in the Crouse bank account or (2) the $546,732 that Mr. Crouse used to purchase the Green-wood residence.

Candra J. Crouse" and (2) Mr. Crouse's guilty plea to the charges in that indictment.

Respondent seems to be arguing that, in determining under section 6015(b)(1)(C) whether at the time Ms. Crouse signed the 2001 joint return she had actual knowledge of the understatement attributable to the four official checks in question totaling $269,307.82, the only question that we must resolve is whether at the time Ms. Crouse signed the 2001 joint return she had actual knowledge of those checks because, according to respondent, she endorsed them and deposited them into the Crouse bank account. We disagree that that is the only question that we must resolve. In making the determination of actual knowledge under section 6015(b)(1)(C), we must decide whether at the time Ms. Crouse signed the 2001 joint return she knew about the understatement in that return that is attributable to the failure to include in gross income in that return the total amount (i.e., $269,307.82) of the four official checks in question.

We not only disagree with respondent that the only question that we must resolve under section 6015(b)(1)(C) with respect to the four official checks in question is whether at the time Ms. Crouse signed the 2001 joint return she had actual knowledge of those checks; we also disagree with respondent's contention that Ms. Crouse had actual knowledge of those checks. According to

respondent, Ms. Crouse had actual knowledge of those checks because she endorsed them and deposited them into the Crouse bank account. Ms. Crouse testified that Mr. Crouse forged her signature on those four official checks and deposited them into the Crouse bank account.[29] We found Ms. Crouse to be credible and believe that she did not endorse the four official checks in question and did not deposit them into that bank account. On the record before us, we find that at the time Ms. Crouse signed the 2001 joint return she did not have actual knowledge of the four official checks in question totaling $269,307.82 that Mr. Crouse embezzled. A fortiori, we further find on the record before us that at the time Ms. Crouse signed the 2001 joint return she did not have actual knowledge of the understatement in that return that is attributable to petitioners' failure to include that total amount in gross income in that return.

We now turn to whether, as respondent argues, Ms. Crouse had constructive knowledge of the understatement in the 2001 joint return that is attributable to petitioners' failure to include in gross income the embezzled amounts totaling $896,039.82.[30] In

_____

[29]The four official checks that were made payable to Ms. Crouse on which respondent relies are not a part of the record in this case.

[30]Respondent argues that Ms. Crouse had constructive knowledge of (1) the $80,000 official check that was made payable to Mr. Crouse and that was deposited in the Crouse bank account and (2) the $546,732 that Mr. Crouse used to purchase the Greenwood

(continued...)

support of respondent's argument, respondent relies on the facts that $349,307.82 was deposited into the Crouse bank account, over which Ms. Crouse had signatory authority, and $546,732 was used to purchase the Greenwood residence.

Respondent seems to be arguing that, in determining under section 6015(b)(1)(C) whether at the time Ms. Crouse signed the 2001 joint return she had constructive knowledge of the understatement attributable to the embezzled amounts totaling $896,039.82, the only question that we must resolve is whether at that time Ms. Crouse had constructive knowledge of those embezzled amounts which were deposited into the Crouse bank account and used to purchase the Greenwood residence. We disagree. In making that determination, we must decide whether at the time Ms. Crouse signed the 2001 joint return she had reason to know about the understatement in that return that is attributable to the failure to include in gross income in that return the embezzled amounts totaling $896,039.82.

We have found that Ms. Crouse had signatory authority over, and withdrew funds from, the Crouse bank account into which Mr. Crouse deposited during 2001 $349,307.82 of the embezzled amounts totaling $896,039.82. We have also found that in May 2001 Ms.

───────────────

[30](...continued)
residence. In addition, respondent argues in the alternative to respondent's argument that Ms. Crouse had actual knowledge of the four official checks in question totaling $269,307.82 that she had constructive knowledge of those four official checks.

Crouse moved into the Greenwood residence which Mr. Crouse purchased with $546,732 of those embezzled amounts and that she did not make any inquiries of Mr. Crouse or anyone else with respect to the source of those funds. On the record before us, we find that at the time Ms. Crouse signed the 2001 joint return she had reason to know that petitioners had income for 2001 equal to the embezzled amounts totaling $896,039.82 that Mr. Crouse deposited into the Crouse bank account and used to purchase the Greenwood residence during 2001.

We must now determine, as discussed above, whether at the time Ms. Crouse signed the 2001 joint return she had reason to know that the embezzled amounts totaling $896,039.82 that Mr. Crouse deposited into the Crouse bank account and used to purchase the Greenwood residence during 2001 were not included in gross income in that return. In other words, we must determine whether at the time Ms. Crouse signed the 2001 joint return she had reason to know of the understatement in that return that is attributable to the failure to include in gross income the embezzled amounts totaling $896,039.82. In making that determination, we bear in mind that a taxpayer, like Ms. Crouse, who signs a tax return without reviewing it is charged with constructive knowledge of its contents. See Bokum v. Commissioner, 94 T.C. 126, 148 (1990), affd. 992 F.2d 1132 (11th Cir. 1993). We also bear in mind that for purposes of section 6015(b)(1)(C) a requesting

spouse has reason to know of an understatement if at the time of signing a tax return a reasonably prudent taxpayer under the circumstances of the requesting spouse could have been expected to know of the omission of income in that return or that further inquiry or investigation was warranted.  See <u>Stevens v. Commissioner</u>, 872 F.2d 1499, 1505 (11th Cir. 1989), affg. T.C. Memo. 1988-63; <u>Shea v. Commissioner</u>, 780 F.2d 561, 566 (6th Cir. 1986), affg. in part and revg. in part on another ground T.C. Memo. 1984-310; <u>Bokum v. Commissioner</u>, <u>supra</u> at 148.[31]

In determining whether in signing a tax return a requesting spouse had reason to know of the understatement in the return that is attributable to an omission of income, we shall consider (1) the circumstances facing the requesting spouse at the time that spouse signed the return and (2) whether a reasonable person faced with those circumstances would have known of the omission. See <u>Alt v. Commissioner</u>, 101 Fed. Appx. at 41.  In making that determination, we may examine several factors, including: (1) The requesting spouse's level of education; (2) the requesting spouse's involvement in the family's financial affairs; (3) the nonrequesting spouse's evasiveness and deceit concerning the family's financial affairs; and (4) the presence of expendi-

---

[31]The requirement of sec. 6015(b)(1)(C) is substantially identical to the requirement of former sec. 6013(e)(1)(C).  As a result, cases interpreting former sec. 6013(e)(1)(C) remain instructive to our analysis under sec. 6015(b)(1)(C).  <u>Butler v. Commissioner</u>, 114 T.C. 276, 283 (2000).

tures that are lavish or unusual when compared to the requesting spouse's past standard of living.  See Alt v. Commissioner, 101 Fed. Appx. at 41; Stevens v. Commissioner, supra at 1505; Butler v. Commissioner, 114 T.C. 276, 284 (2000); Flynn v. Commissioner, 93 T.C. 355, 365-366 (1989).  (We shall refer to the above-listed factors as the education factor, the involvement in financial affairs factor, the evasiveness and deceit factor, and the lavish or unusual expenditures factor, respectively.)

We have found that Ms. Crouse signed the 2001 joint return. As discussed above, Ms. Crouse is charged with constructive knowledge of its contents.  See Bokum v. Commissioner, supra at 148.  As a result, when Ms. Crouse signed the 2001 joint return she constructively knew that petitioners attached to that return the 2001 Redwood Schedule K-1, in which Redwood showed, inter alia, (1) $1,050,796 as Mr. Crouse's share of Redwood's ordinary income from trade or business activities and (2) $854,356 of withdrawals by, or distributions to, Mr. Crouse.[32]  She also constructively knew at that time (1) that petitioners attached to that return the 2001 Schedule E, (2) that in that schedule petitioners, inter alia, (a) reported the $1,050,796 of ordinary income from trade or business activities that Redwood showed on

_____

[32]As discussed below, Mr. Crouse argues that the embezzled amounts totaling $896,039.82 were reported in the 2001 joint return.  That is because, according to Mr. Crouse, those amounts were shown as withdrawals by, or distributions to, Mr. Crouse in the 2001 Redwood Schedule K-1.

the 2001 Redwood Schedule K-1 and (b) reported the 2001 Administration loss of $3,376,356, and (3) that that 2001 Administration loss exceeded that Redwood ordinary income and all other income reported in that schedule.[33]

We are unable to find on the basis of Ms. Crouse's constructive knowledge of the information in the 2001 joint return that she had reason to know that petitioners failed to include in gross income in that return the embezzled amounts totaling $896,039.82. We are also unable to find on the basis of our examination of the education factor, the involvement in financial affairs factor, the evasiveness and deceit factor, and the lavish or unusual expenditures factor that at the time Ms. Crouse signed the 2001 joint return she had reason to know that petitioners omitted from gross income in that return the embezzled amounts totaling $896,039.82.

With respect to the education factor, we have found that Ms. Crouse has a bachelor of science degree in telecommunications. However, at the time of the trial in this case, Ms. Crouse did not have any education or work experience in tax, financial, or accounting matters. Although we have found that Ms. Crouse worked for approximately two months in the customer service

---

[33]In the 2001 Schedule E, petitioners also reported $1,043,295 of ordinary income from trade or business activities that Marketing showed in the 2001 Marketing Schedule K-1, and $16,156 of total rental real estate income from two rental real estate properties. See supra note 13.

department of a company identified as TRG, we have also found that at no time did Ms. Crouse participate in any business decisions of Redwood, Marketing, or Administration. We find nothing in the record regarding Ms. Crouse's education or work experience that shows that at the time Ms. Crouse signed the 2001 joint return she had reason to know about the understatement in that return that is attributable to the embezzled amounts totaling $896,039.82.

With respect to the involvement in financial affairs factor, Ms. Crouse contends that she "was a stay-at-home mother and had no knowledge of any business or personal financial dealings of William Paul Crouse." As discussed above, although we have found, as respondent points out, that Ms. Crouse worked for approximately two months in the customer service department of a company identified as TRG, we have also found that at no time did Ms. Crouse participate in any business decisions of Redwood, Marketing, or Administration. On the record before us, we find that Ms. Crouse had no involvement in the financial affairs of Mr. Crouse or any of those companies in which he owned a 50-percent interest.

With respect to the evasiveness and deceit factor, Ms. Crouse contends that "Paul [Mr. Crouse] deceitfully maintained all our accounts, taxes, and large purchases." The record does not establish whether Ms. Crouse made any inquiries of Mr. Crouse

regarding their financial affairs. However, we have found that Mr. Crouse embezzled approximately $1.29 million from Redwood, Marketing and/or Administration and that Mr. Crouse pleaded guilty (1) in the District Court to six counts of embezzlement and one count of money laundering and (2) in a Florida State court to a charge of operating an insurance company without a license. On the record before us, it is reasonable to believe that Mr. Crouse was not honest, candid, or forthcoming with Ms. Crouse regarding his embezzlement activities, let alone regarding whether the amounts that he embezzled were reported in the 2001 joint return.[34]

With respect to the lavish or unusual expenditures factor, we have found that in 2001 Mr. Crouse used $546,732 of the embezzled funds to purchase the Greenwood residence. The record does not contain any evidence with respect to any other expenditures that petitioners may have made in 2001, the year at issue, or in any other year from which we may determine whether petitioners' expenditures in 2001 were lavish or unusual when compared to their usual spending habits.

---

[34]As discussed above, Mr. Crouse argues that the embezzled amounts totaling $896,039.82 were reported in the 2001 joint return. As discussed below, we believe on the record before us that if at the time Ms. Crouse signed the 2001 joint return she had been aware that Mr. Crouse had embezzled funds and if at that time she had made inquiries of Mr. Crouse regarding whether the amounts that Mr. Crouse embezzled were reported in the 2001 joint return, Mr. Crouse would have told her, as he argues here, that those amounts were reported in that return.

On the record before us, we find that under the circumstances existing at the time Ms. Crouse signed the 2001 joint return a reasonably prudent taxpayer could not have been expected to know of the omission in the 2001 joint return of the embezzled amounts totaling $896,039.82. On that record, we further find that Ms. Crouse had no reason to know of the understatement in the 2001 joint return that is attributable to petitioners' failure to include in gross income those embezzled amounts.

Respondent argues that, even if under the circumstances existing at the time Ms. Crouse signed the 2001 joint return she had no reason to know that petitioners failed to include in gross income the embezzled amounts totaling $896,039.82, Ms. Crouse nonetheless had a duty to inquire about the source of the funds that were deposited into the Crouse bank account and that were used to purchase the Greenwood residence.

Respondent seems to be arguing that, in determining under section 6015(b)(1)(C) whether at the time Ms. Crouse signed the 2001 joint return she had a duty to inquire or to investigate further, the only question that we must resolve is whether at that time Ms. Crouse had a duty to inquire as to the source of the funds that were deposited in the Crouse bank account and that were used to purchase the Greenwood residence. We disagree. In making that determination, we must decide whether at the time Ms. Crouse signed the 2001 joint return she should have inquired

or investigated further as to whether the embezzled amounts totaling $896,038.82 had been reported in the 2001 joint return. See Stevens v. Commissioner, 872 F.2d at 1505; Shea v. Commissioner, 780 F.2d at 566; Bokum v. Commissioner, 94 T.C. at 148.

It is significant in our analysis under section 6015(b)(1)(C) with respect to Ms. Crouse's duty to inquire or investigate further that Mr. Crouse argues that respondent's determination to include in gross income the embezzled amounts totaling $896,039.82 is erroneous because petitioners reported those amounts in the 2001 joint return. On the record before us, we believe that even if (1) Ms. Crouse had asked Mr. Crouse about the source of the $896,039.82 of funds that were deposited into the Crouse bank account and used to purchase the Greenwood residence and (2) Mr. Crouse had admitted to Ms. Crouse, which the record does not establish, that he had embezzled those funds, Mr. Crouse would have told her, as he argues here, that those funds were reported in the 2001 joint return. Although Ms. Crouse did not make any inquiries about the accuracy of the 2001 joint return at the time she signed it, we shall not penalize her for failing to do so where such an inquiry would almost certainly have resulted in Mr. Crouse's assuring her that that return was accurate with respect to, inter alia, the embezzled amounts totaling $896,039.82.

Based upon our examination of the entire record before us, we find that at the time Ms. Crouse signed the 2001 joint return a reasonably prudent taxpayer under her circumstances could not have been expected to know of the omission from gross income in that return of the embezzled amounts totaling $896,039.82 or that further investigation was warranted.  On that record, we further find that Ms. Crouse did not know, and had no reason to know, of the understatement in the 2001 joint return that is attributable to petitioners' failure to include in gross income the embezzled amounts totaling $896,039.82.  On the record before us, we find that petitioner satisfies section 6015(b)(1)(C) with respect to the portion of the understatement that is attributable to that failure.

We now address whether Ms. Crouse satisfies section 6015(b)(1)(D) with respect to the portion of the understatement for 2001 that is attributable to petitioners' failure to include in gross income the embezzled amounts totaling $896,039.82.  In order to satisfy section 6015(b)(1)(D), Ms. Crouse must establish that, taking into account all of the facts and circumstances, it is inequitable to hold her liable for that portion of that under- statement.  The requirement of section 6015(b)(1)(D) that Ms. Crouse must satisfy is virtually identical to the requirement of former section 6013(e)(1)(D), and cases interpreting former

section 6013(e) remain instructive in our analysis.  See <u>Alt v. Commissioner</u>, 119 T.C. at 313-314.

The factors that we consider in determining whether it would be inequitable for purposes of section 6015(b)(1)(D) are the same factors that we consider in determining whether it would be inequitable for purposes of section 6015(f).  See <u>id.</u> at 316.  One factor considered in determining whether it would be inequitable for purposes of section 6015(f) and thus for purposes of section 6015(b)(1)(D), see <u>id.</u>, is whether in signing the tax return the requesting spouse did not know, and had no reason to know, of an understatement in that return, see Rev. Proc. 2003-61, sec. 4.03(2)(a)(iii)(B), 2003-2 C.B. 296, 298.  In determining whether a requesting spouse satisfies section 6015(b)(1)(D), we may consider, inter alia, whether such spouse satisfies section 6015(b)(1)(C).[35]  We have found that Ms. Crouse satisfies section 6015(b)(1)(C) with respect to the portion of the understatement for 2001 that is attributable to petitioners' failure to include in gross income the embezzled amounts of $896,039.82.  We further find for purposes of section 6015(b)(1)(D) that at the time Ms. Crouse signed the 2001 joint return she did not know, and had no reason to know, of that portion of that understatement.

---

[35]See <u>Haltom v. Commissioner</u>, T.C. Memo. 2005-209.

Other relevant factors that we may consider in determining whether a requesting spouse satisfies section 6015(b)(1)(D) include whether (1) the requesting spouse was deserted, divorced, or separated (marital status factor); (2) the requesting spouse would suffer economic hardship if relief were not granted (economic hardship factor); and (3) the requesting spouse made a good faith effort to comply with the tax laws for the taxable years following the taxable year to which the request for relief related (tax compliance factor).  See Washington v. Commissioner, 120 T.C. 137, 147 (2003); Alt v. Commissioner, 119 T.C. at 314-316.

With respect to the marital status factor, we have found that at all relevant times, including during the year at issue, at the time Mr. Crouse was released from prison on November 27, 2009, and at the time of the trial in this case, Mr. Crouse and Ms. Crouse were married.  We have also found that around February or March 2010, several months before the trial in this case, Mr. Crouse filed for divorce and that at an undisclosed time between November 27, 2009, and the date of the trial, petitioners began living separate and apart.

With respect to the economic hardship factor, we have found (1) that around March 24, 2009, Ms. Crouse filed Ms. Crouse's Form 8857; (2) that in that form Ms. Crouse claimed that she had total monthly income of $4,166 and total monthly expenses

of $4,142; (3) that around May 2009, after Ms. Crouse filed Ms. Crouse's Form 8857, she discontinued her home telephone service, which she claimed in that form cost $92 a month; (4) that during 2010 Ms. Crouse received a 4.5-percent raise in her salary and that at the time of trial in this case she no longer maintained the storage unit costing $75 per month that she claimed in Ms. Crouse's Form 8857; and (5) that at the time of the trial in this case Ms. Crouse had total monthly income of $4,353 and total monthly expenses of $4,010.

The 4.5-percent raise that Ms. Crouse received in 2010 increased her monthly salary from the $4,166 that she claimed in Ms. Crouse's Form 8857 to $4,353. The elimination of the expenses for Ms. Crouse's home telephone service and the storage unit that she claimed in Ms. Crouse's Form 8857 reduced her total monthly expenses from $4,142 to $3,975. Even taking into account the Federal, State, and local taxes that she must pay on the additional salary that she was earning at the time of the trial in this case, which we estimate to be approximately $35 per month, on the record before us, we find that Ms. Crouse's monthly salary exceeds her monthly expenses by $343. On the record before us, we find that Ms. Crouse would not suffer economic hardship if relief under section 6015(b) were not granted.

With respect to the tax compliance factor, we have found that at the time of the trial in this case Ms. Crouse had not

filed timely a tax return for any of her taxable years 2003 through 2008[36] and had not paid timely the tax due for any of her taxable years 2003 through 2006.

With respect to other factors that we may consider, we find it significant that Ms. Crouse did not receive a significant benefit from the embezzled amounts. Although respondent's examiner acknowledged in the examination workpaper that Ms. Crouse did not receive a significant benefit from the embezzled amounts, on brief respondent relies on Alt v. Commissioner, 119 T.C. 306 (2002), in support of respondent's argument that Ms. Crouse received a significant benefit beyond normal support because "a residence worth at least $546,000 is clearly in excess of normal support." We find Alt to be materially distinguishable from the instant case and respondent's reliance on that case to be misplaced. In Alt, we found that the requesting spouse had received a significant benefit because the taxpayers (1) purchased a 600-

---

[36]At trial, the parties offered as exhibits respective documents entitled "CERTIFICATE OF OFFICIAL RECORD" (certificate) with respect to each of Ms. Crouse's taxable years 2002 through 2009. Each of those documents purported to certify that Ms. Crouse had not filed a tax return or paid tax for the respective year to which it pertained. At trial, counsel for respondent admitted that the document pertaining to Ms. Crouse's taxable year 2002 was incorrect and that Ms. Crouse had filed a joint return with Mr. Crouse for that year and that there was no tax due for that year. As a result, we expressed concern at trial about the accuracy of the respective certificates pertaining to Ms. Crouse's taxable years 2003 through 2009. However, Ms. Crouse testified that she attempted to file tax returns for certain of those years but failed to do so for taxable years 2003 through 2007.

acre riverfront property upon which they were building a mansion, (2) purchased a house for each of their four children, (3) acquired a business for their son, and (4) fully paid for the undergraduate and graduate educations of their children. Id. at 314. Respondent offers no reason other than respondent's reliance on Alt why the purchase of the Greenwood residence constitutes a significant benefit to Ms. Crouse. On the record before us, we find that Ms. Crouse did not receive a significant benefit from the embezzled amounts totaling $896,039.82.

Based upon our examination of the entire record before us, we find that, taking into account all of the facts and circumstances, it would be inequitable to hold Ms. Crouse liable for the portion of the understatement for 2001 that is attributable to petitioners' failure to include in gross income the embezzled amounts totaling $896,039.82. On that record, we further find that Ms. Crouse satisfies section 6015(b)(1)(D) with respect to that portion of that understatement.

Based upon our examination of the entire record before us, we find that petitioner is entitled to relief under section 6015(b) for that portion of the understatement for 2001 that is attributable to petitioners' failure to include in gross income the embezzled amounts totaling $896,039.82.[37]

---

[37]In the light of our finding that Ms. Crouse is entitled to relief under sec. 6015(b) for the portion of the understatement

                                                          (continued...)

Section 6015(c)

We turn now to whether Ms. Crouse is entitled to relief under section 6015(c) for the portion of the deficiency for 2001 that is attributable to the self-employment tax on Ms. Crouse's 2001 nonemployee compensation.  Section 6015(c) provides in pertinent part:

> SEC. 6015.    RELIEF FROM JOINT AND SEVERAL LIABILITY ON JOINT RETURN.
>
> (c) Procedures To Limit Liability for Taxpayers No Longer Married or Taxpayers Legally Separated or Not Living Together.--
>
>> (1) In general.--Except as provided in this subsection, if an individual who has made a joint return for any taxable year elects the application of this subsection, the individual's liability for any deficiency which is assessed with respect to the return shall not exceed the portion of such deficiency properly allocable to the individual under subsection (d).
>
> *       *       *       *       *       *       *
>
>> (3) Election.--
>>
>>> (A) Individuals eligible to make election.--
>>>
>>>> (i) In general.--An individual shall only be eligible to elect the application of this subsection if--
>>>>
>>>>> (I) at the time such election is filed, such individual is no longer

---

[37](...continued) for 2001 that is attributable to petitioners' failure to include in gross income the embezzled amounts totaling $896,039.82, we need not and shall not address Ms. Crouse's claim for relief under sec. 6015(f) for that portion of that understatement.

married to, or is legally separated from, the individual with whom such individual filed the joint return to which the election relates; or

(II) such individual was not a member of the same household as the individual with whom such joint return was filed at any time during the 12-month period ending on the date such election is filed.

Section 1.6015-3(b)(3)(i), Income Tax Regs., provides:

(3) Members of the same household.--(i) Temporary absences.--A requesting spouse and a nonrequesting spouse are considered members of the same household during either spouse's temporary absences from the household if it is reasonable to assume that the absent spouse will return to the household, and the household or a substantially equivalent household is maintained in anticipation of such return. Examples of temporary absences may include, but are not limited to, absence due to incarceration, illness, business, vacation, military service, or education.

We shall consider only whether Ms. Crouse meets the requirements of section 6015(c)(3)(A)(i) and the regulations thereunder. That is because our resolution of that question resolves the issue of whether petitioner is entitled to relief under section 6015(c) with respect to the portion of the deficiency for 2001 that is attributable to the self-employment tax on Ms. Crouse's 2001 nonemployee compensation.

Respondent argues that Ms. Crouse does not satisfy the requirements of section 6015(c)(3)(A)(i) and the regulations thereunder. According to respondent:

In this case, petitioner [Ms. Crouse] was neither divorced nor legally separated from Mr. Crouse on March

24, 2009, the date upon which she filed her claim for relief. * * * Moreover, petitioners did not even dis-cuss divorce until after Mr. Crouse's release [from prison] on November 27, 2009. Consequently, Mr. Crouse's incarceration constituted a temporary absence under Treas. Reg. § 1.6015-3(b)(3). As a result, Ms. Crouse is not entitled to relief under section 6015(c).

On the record before us, we agree with respondent. We have found that (1) at all relevant times, including during the year at issue, at the time Mr. Crouse was released from prison on November 27, 2009, and at the time of the trial in this case, Mr. Crouse and Ms. Crouse were married, (2) before Mr. Crouse was released from prison on November 27, 2009, petitioners had not discussed whether they would divorce, and neither Mr. Crouse nor Ms. Crouse had filed for divorce as of that date, (3) that around February or March 2010, several months before the trial in this case, Mr. Crouse filed for divorce, and (4) around March 24, 2009, approximately eight months before Mr. Crouse was released from prison and approximately one year before petitioners filed for divorce, Ms. Crouse filed Ms. Crouse's Form 8857.

On the record before us, we find that on the date on which Ms. Crouse made the election under section 6015(c) she was not divorced or legally separated from Mr. Crouse. See sec. 6015(c)(3)(A)(i)(I). On that record, we further find that on the date on which Ms. Crouse made the election under section 6015(c) she had been a member of the same household as Mr. Crouse during the 12-month period ending on the date Ms. Crouse made her elec-

tion.[38] See sec. 6015(c)(3)(A)(i)(II); sec. 1.6015-3(b)(3)(i), Income Tax Regs. On the record before us, we find that Ms. Crouse is not eligible to make an election under section 6015(c).

On the record before us, we find that Ms. Crouse is not entitled for her taxable year 2001 to relief under section 6015(c) for the portion of the deficiency that is attributable to the self-employment tax on Ms. Crouse's 2001 nonemployee compensation.

Section 6015(f)

We turn finally to whether Ms. Crouse is entitled to relief under section 6015(f) for the portion of the deficiency for 2001 that is attributable to the self-employment tax on Ms. Crouse's 2001 nonemployee compensation. Section 6015(f) provides:

> SEC. 6015. RELIEF FROM JOINT AND SEVERAL LIABILITY ON JOINT RETURN.
>
> (f) Equitable Relief.--Under procedures prescribed by the Secretary, if--
>
> (1) taking into account all the facts and circumstances, it is inequitable to hold the individual liable for any unpaid tax or any deficiency (or any portion of either); and

---

[38]In the light of our findings that before Mr. Crouse was released from prison on Nov. 27, 2009, petitioners had not discussed whether to divorce and that neither Mr. Crouse nor Ms. Crouse had filed for divorce as of that date, we find it reasonable to conclude that upon his release from prison Mr. Crouse would return to his family's household and that his absence from that household as a result of his imprisonment was temporary. See sec. 1.6015-3(b)(3)(i), Income Tax Regs.

(2) relief is not available to such individ-
ual under subsection (b) or (c),

the Secretary may relieve such individual of such lia-
bility.

As directed by section 6015(f), the Commissioner of Internal
Revenue (Commissioner) has prescribed procedures in Rev. Proc.
2003-61, supra (Revenue Procedure 2003-61), that are to be used
in determining whether it would be inequitable to find the re-
questing spouse liable for part or all of the deficiency in
question.  Section 4.01 of Revenue Procedure 2003-61 lists the
following threshold conditions (threshold conditions) which must
be satisfied before the Commissioner will consider a request for
relief under section 6015(f):  (1) The requesting spouse filed a
joint tax return for the taxable year for which such spouse seeks
relief; (2) relief is not available to the requesting spouse
under section 6015(b) or (c); (3) the requesting spouse applies
for relief no later than two years after the date of the Ser-
vice's first collection activity after July 22, 1998, with re-
spect to the requesting spouse; (4) no assets were transferred
between the spouses as part of a fraudulent scheme by the
spouses; (5) the nonrequesting spouse did not transfer disquali-
fied assets to the requesting spouse; (6) the requesting spouse
did not file or fail to file the tax return in question with
fraudulent intent; (7) the income tax liability from which the
requesting spouse seeks relief is attributable to an item of the

nonrequesting spouse.  Rev. Proc. 2003-61, sec. 4.01, 2003-2 C.B. at 297.

Respondent argues that Ms. Crouse has failed to satisfy the threshold condition in section 4.01(7) of Revenue Procedure 2003-61 with respect to the portion of the deficiency that is attributable to the self-employment tax on Ms. Crouse's 2001 nonemployee compensation because that compensation is attributable to her.  We have found that the portion of the deficiency attributable to the self-employment tax on Ms. Crouse's 2001 nonemployee compensation is attributable to Ms. Crouse.  On the record before us, we find that Ms. Crouse has failed to satisfy one of the threshold conditions with respect to the portion of the deficiency that is attributable to the self-employment tax on Ms. Crouse's 2001 nonemployee compensation.  See Rev. Proc. 2003-61, sec. 4.01(7).  On that record, we find that Ms. Crouse has failed to carry her burden of establishing that it would be inequitable to hold her liable for that portion of that deficiency.

On the record before us, we find that Ms. Crouse has failed to carry her burden of establishing that she is entitled for her taxable year 2001 to relief under section 6015(f) with respect to the portion of the deficiency that is attributable to the self-employment tax on Ms. Crouse's 2001 nonemployee compensation.

We have considered all of the contentions and arguments of the parties that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.

To reflect the foregoing and respondent's concessions as to Ms. Crouse,

<u>Decision will be entered</u>

<u>under Rule 155</u>.